## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

B.F., by her Next Friend
MOTHER OF B.F.,

Plaintiff,

v.

WARREN CONSOLIDATED SCHOOLS, a
Michigan municipal corporation, ROBERT
LIVERNOIS, JUDY HIRZEL, HELEN
MEDUVSKY, JOSEPH KONAL, KENDALL
GIOVANNINI, KERRY WEISHAUPT,
BERNADETTE FREDERICK, WILLIAM
WALTERS, and DOREEN DICKMAN,

Defendants.

Case No. 13-cv-13714
Hon. Patrick J. Duggan
Magistrate Paul J. Komives

_____/

| | |
|---|---|
| SEIKALY STEWART & BENNETT, P.C. | GIARMARCO MULLINS & |
| Attorneys for Plaintiff | HORTON P.C. |
| WILLIAM R. SEIKALY (P33165) | Attorneys for Defendant |
| BENJAMIN J. WILENSKY (P75302) | DANIEL J. KELLY (P41315) |
| CHOI T. PORTIS (P77123) | Tenth Floor Columbia Center |
| 30445 Northwestern Hwy., Ste. 250 | 101 W. Big Beaver Rd. |
| Farmington Hills, Michigan 48334 | Troy, Michigan 48084 |
| (248) 785-0102 | (248) 457-7025 |
| wrs@sslawpc.com | dkelly@gmhlaw.com |

_____/

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, B.F., by her Next Friend, Mother of B.F., by

and through her attorneys, SEIKALY STEWART & BENNETT, P.C., and for all

the reasons identified in the attached Brief, respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

SEIKALY STEWART & BENNETT, P.C.
Attorneys for Plaintiff

By: ___/s/ William R. Seikaly_____

William R. Seikaly (P33165)
Benjamin J. Wilensky (P75302)
30445 Northwestern Hwy., Ste. 250
Farmington Hills, Michigan 48334
(248) 785-0102
wrs@sslawpc.com

Dated: August 7, 2015

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

B.F., by her Next Friend
MOTHER OF B.F.,                          Case No. 13-cv-13714
                                         Hon. Patrick J. Duggan
        Plaintiff,                       Magistrate Paul J. Komives

v.

WARREN CONSOLIDATED SCHOOLS, a
Michigan municipal corporation, ROBERT
LIVERNOIS, JUDY HIRZEL, HELEN
MEDUVSKY, JOSEPH KONAL, KENDALL
GIOVANNINI, KERRY WEISHAUPT,
BERNADETTE FREDERICK, WILLIAM
WALTERS, and DOREEN DICKMAN,

        Defendants.
_____/

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

      A.    Background of the Students ........................................................... 3

      B.    Early Issues at School ................................................................... 5

      C.    Specific Directives to the School District to Keep B.H. Away From Other Children ............................................................... 8

      D.    Additional Concerns About B.H. and B.F. ................................... 9

      E.    The Precautions That Were Supposed to be Taken for B.H.'s and B.F.'s Bus Ride To School ............................................... 9

      F.    How B.H. was Accomplishing the Assaults ................................ 10

      G.    How Long Had the Sexual Assaults Been Occurring? .................. 12

      H.    What did Warren Consolidated Schools Transportation Know and When Did They Know It? ................................................. 13

ARGUMENT ........................................................................................................ 17

   I.    PLAINTIFF'S CLAIMS UNDER M.C.L. § 722.623 ARE NOT SUBJECT TO SUMMARY DISPOSITION BECAUSE THEY HAD REASONABLE CAUSE TO SUSPECT ABUSE BUT FAILED TO REPORT IT ...................................................... 17

      A.    M.C.L. § 722.623 should not be interpreted as being subject to governmental immunity provisions. ......................................... 17

      B.    Even if the Court applies *Robinson*, Defendants still are not entitled to summary judgment. ................................................... 20

   II.   PLAINTIFF'S TITLE IX CLAIM IS NOT AMENABLE TO SUMMARY JUDGMENT. ....................................................... 23

      A.    Plaintiff has shown harassment that was severe or pervasive ......... 23

      B.    Plaintiff has shown actual notice of the harassment. ..................... 24

      C.    Plaintiff has shown deliberate indifference to the harassment. ....... 28

   III.   PLAINTIFF'S CLAIMS UNDER THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (M.C.L. § 37.2102) ARE NOT AMENABLE TO SUMMARY JUDGMENT, BECAUSE DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE HARASSING BEHAVIOR, YET DID NOTHING, ...................................................... 32

   IV.   PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983 ARE NOT AMENABLE TO SUMMARY JUDGMENT, BECAUSE DELIBERATE INDIFFERENCE IS SHOWN AT EACH PHASE OF THE CASE ........................................................... 34

      A.    The danger encountered by Plaintiff was state-created by these Defendants.. 34

i

B.    Plaintiff's claims against the individual defendants are brought against them in their individual capacity. ................................................................................ 39

C.    The individual Defendants are not entitled to qualified immunity. ................. 42

CONCLUSION ............................................................................................................45

CERTIFICATE OF SERVICE .....................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Abdur-Rahman v. Michigan Dept. of Corrections*, 65 F.3d 489 (6th Cir. 1995) ....47

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).................................................................................................................17

*Apsey v. Memorial Hosp.*, 477 Mich. 120 (2007)...................................................18

*Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001)..................................................26

*Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355 (3d Cir. 2005)......................................27

*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) ....................................................39

*Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003) ..........................40

*Chambers v. Trettco*, 463 Mich. 297 (2000)...........................................................36

*Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. 2001) ................................32

*Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001) ...................................................39

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ........................... 31, 34

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) .......................................30

*DeShaney v. Winnebago Cty. Dept. of Soc. Svcs.*, 489 U.S. 189 (1989).................38

*Doe ex rel. Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906 (9th Cir. 2003) ..............48

*Doe v. City of Roseville*, 296 F.3d 431 (6th Cir. 2002) ..........................................32

*Doe v. Claiborne Cty.*, 103 F.3d 495 (6th Cir. 1996) ....................................... 38, 51

*Dominque v. Telb*, 831 F.2d 673 (6th Cir.1987).....................................................51

*Escue v. N. Okla. Coll.*, 450 F.3d 1146 (10th Cir. 2006)........................................26

*Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134 (2d Cir. 1999) ............................32

*Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998)............................... 26, 30

*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) .....................................................48

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................48

*Hart v. Paint Valley Local Sch. Dist.*, 2002 WL 31951264, at *8 (S.D. Ohio 2002) ............................................................................................................................33

*In re Akron-Cleveland Auto Rental, Inc. v. Akron-Cleveland Auto Rental, Inc.*, 921 F.2d 659 (6th Cir. 1990) .......................................................................................20

*Johnson v. University of Michigan Regents*, 2004 WL 2873831, *3 .....................36

*Jones v. Bitner*, 300 Mich. App. 65 (2013).......................................................... 18, 19

*Jones v. City of Carlisle, Ky.*, 3 F.3d 945 (6th Cir. 1993) .......................................42

*Jones v. Muskegon County*, 625 F.3d 935 (6th Cir. 2010) ......................................22

*Jones v. Reynolds*, 438 F.3d 685, 690-91 (6th Cir. 2005) .......................................40

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ..............................39

*Logan v. Denny's*, 259 F.3d 558 (6th Cir 2001). .....................................................16

*Lopez v. Metropolitan Gov't of Nashville and Davidson Cty.*, 646 F.Supp.2d 891 (M.D. Tenn. 2009).......................................................................... 28, 29, 40, 41

*McCarthy v. State Farm Ins. Co.*, 170 Mich. App. 451, 428 N.W.2d 692 (1988)..37

*McCoy v. Bd. of Educ., Columbus City Schools*, 515 Fed. Appx. 387 (6th Cir. 2013)......................................................................................................................34

*Molina v. Bd. of Educ. of School Dist. for City of Detroit, 2007 WL 4454928 (E.D. Mich. 2007)*.............................................................................................................43

*Moore v. City of Harriman*, 272 F.3d 769 (6th Cir. 2001) .....................................45

*Murphy v. Gilman*, 551 F.Supp.2d 677 (W.D. Mich. 2008)...................................23

*Norris v. State Farm Fire and Casualty Co.,* 229 Mich.App. 231, 581 N.W.2d 746 (2001)...................................................................................................................37

*Patterson v. Hudson Area Schools*, 551 F.3d 438 (6th Cir. 2009) .........................25

*Pearson v. Callahan*, 555 U.S. 223 (2009).............................................................47

*Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450 (8th Cir. 2009) ....................30

*Preschooler II v. Clark County School*, 479 F.3d 1175 (9th Cir. 2007)............ 48, 49

*Robinson v. City of Detroit*, 462 Mich. 439 (2000). .................................... 17, 19, 23

*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005)................................................. 50, 51

*Saucier v. Katz*, 533 U.S. 194 (2001) ............................................................... 48, 50

*Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005) .............................42

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................49

*Sheridan v. Forest Hills Public Schools*, 247 Mich. App. 611 (2001)....................36

*Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999)............................................. 26, 38, 43

*Sova v. City of Mount Pleasant*, 142 F.3d 898 (6th Cir. 1998) ...............................49

*Tolan v. Cotton*, ___ U.S. ___, ___; 134 S.Ct. 1861 (2014) ...................................16

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)...................................................................49

*U.S. v. Tohono O'Odham Nation*, 131 S.Ct. 1723 (2011);......................................18

*Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000)31, 32, 33, 34

*Waller v. Trippett*, 49 Fed. Appx. 45 (6th Cir. 2002) ...............................................42

*Wells v. Brown, Jr.*, 891 F.2d 591 (6th Cir. 1989)...................................................45

*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005) ...................................................................................................................................27

*Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005)...............31

## Statutes

20 U.S.C. § 1681 .................................................... 24, 25, 26, 28, 29, 31, 37

20 U.S.C. § 1681(a) ....................................................................................................24

M.C.L. § 37.2102 ........................................................................................................35

M.C.L. § 37.2102 (1) ..................................................................................................36

M.C.L. § 691.1407......................................................................................................22

M.C.L. § 691.1407(2) ........................................................................................... 18, 21

M.C.L. § 691.1407(2)(c) ..............................................................................22

M.C.L. § 691.1407(8)(a) ..............................................................................22

M.C.L. § 722.623(1)(a) ................................................................................19

M.C.L. § 722.633(1) ....................................................................................20

M.C.L. § 750.520b ........................................................................................25

M.C.L. § 750.520c ........................................................................................25

**Rules**

Fed. R. Civ. P. 15(a)(2) ................................................................................47

Fed. R. Civ. P. 56 .........................................................................................15

Fed. R. Civ. P. 56(c)(1)(a). ..........................................................................16

## INTRODUCTION

This case concerns the serious, repeated sexual abuse of the Plaintiff by a fellow special education student, referred to throughout by his initials: B.H.  Both students were enrolled in the Warren Consolidated Schools[1].  At the time of the sexual contacts, the children were approximately 10 years-old. The contacts occurred on a bus also operated by the Defendant Warren Consolidated Schools ("WCS").  The facts set forth below show that School District personnel had been warned *by the child-perpetrator's own parents* that he was a danger to other children, was hypersexual, and needed to be kept *away* from other students on the bus. They were also on notice that Plaintiff, due to her disability, was overly friendly and trusting of others, often hugging strangers and following others' instructions without reservation.

Finally, the District was well aware of the fact that these two children claimed to be attracted to one another and said they *planned to marry*.  Yet, the School District not only ignored the risk they created by putting these children on a school bus with one another, but did it with the knowledge that, one of the Defendants, Helen Meduvsky("Meduvsky"), the bus aide, literally slept through

---

[1] While the conduct by B.H. to B.F. is described in this brief as sexual assault, it is obvious, given the disabilities of both students and the total disregard by the school system of their need for careful supervision, that they were both victims of the deliberate indifference of the school system.

the daily bus rides, on a regular basis, oblivious to what was going on behind her. Additionally, to the District administrators' knowledge, Meduvsky simply refused to put into effect a policy of keeping the children separated that had been designed to prevent what actually occurred here.

Thus, the District was clearly aware, yet was wholly indifferent to the known danger, even though they had actual knowledge that both of the precautions that were needed and developed to address the problem were never implemented. Neither the bus driver nor the bus aide followed the directives, nor intervened to monitor the children or protect the Plaintiff, despite the rules regarding assigned seats, and despite the fact that they were supposed to complete behavioral reports on students who displayed chronic inappropriate behavior. Hatherly Elementary School Parent Handbook (Exhibit 1); Deposition of Meduvsky at 86:10-16 (Exhibit 2). Evidence of the ongoing indifference includes the fact that no action was ever taken against the bus aide for sleeping on the job and failing to enforce the rules. Meduvsky Warning Letters (Exhibit 3).

B.H.'s inappropriate sexual contact with B.F. on the bus occurred regularly. Warren Police Department Case Report (Exhibit 4). The conduct occurred without interruption, reporting or intervention by Warren Consolidated Schools' staff. The District took no action to determine the cause of B.F.'s inappropriate self-touching, which occurred in the classroom as a direct result of B.H.'s inappropriate sexual

contact.  B.F.'s teacher, William Walters, felt it was a situation better handled by a female, and chose not to get involved. Deposition of William Walters 89:24-90:7 (Exhibit 5).Walters had a discussion with B.F.'s parents, but never spoke with the school social worker, Doreen Dickman, in an effort to determine the cause of B.F.'s behavior. Deposition of William Walters 89:24- 91:12 (Exhibit 5).

Perhaps even more telling – because it demonstrates a culture of indifference that is historic in Warren Consolidated Schools – is the fact that, even after the story came out, the District took no action against the bus aide. B.H.'s parents demanded that she be fired, but at a minimum, not be on any bus on which he rode. However, when the next school year began, Helen Meduvsky continued as the aide. Deposition of Mother of B.H. 76:7- 77:19 (Exhibit 6). She remained employed by the School District until she voluntarily retired in 2013-2014. Deposition of Karen Henning 35:14-21 (Exhibit 7).

All of this leads to the inescapable conclusion that the Defendants' actions and inactions go far beyond grave error, and into the realm of deliberate indifference.Plaintiff asks that the Court deny the District's meritless motion for summary judgment, and allow this case to proceed to trial.

## STATEMENT OF FACTS

**A.    Background of the Students**

B.F. is a 14 year-old girl with significant special needs.  She was adopted by

her parents in 2007. (Affidavit of Mother of B.F. ¶ 1, Exhibit 8). Very little is known about the early years of the Plaintiff's life. However, what is known is that Plaintiff and her biological siblings were taken away from their biological mother and placed in the foster care system. The two girls were kept together, but were separated from their brother. Plaintiff's adoptive parents received Plaintiff and her younger sister, M.F., when Plaintiff was four years old and her sister was one and a half years old. Deposition of Mother of B.F. at 11:14-21(Exhibit 9).  At this time, Plaintiff's adoptive parents had previously adopted two special needs children. *Id.* 6:13-14; 8:12-16; 12:20-23.  At the time the Plaintiff's parents adopted Plaintiff and her younger sister, they were unaware of the existence of their brother.

It appeared that the girls would stay separated from their brother, and the three might never even know each other. But one day, the family received a call from Social Services. B.F.'s biological (maternal) grandmother was in hospice, and her last request was to see her grandchildren one final time. (Affidavit of Mother of B.F. ¶ 3 (Exhibit 8). Plaintiff's adoptive parents agreed, and in preparing for the visit they learned about B.F.'s younger brother. The children were reunited at their grandmother's deathbed, and Plaintiff's adoptive parents discovered that B.F.'s brother was in a foster care home with no real prospects for adoption. A few weeks later, the Plaintiff's adoptive parents took B.F.'s brother in, and eventually adopted all three children. Affidavit of Mother of B.F. ¶¶ 4 and 5 (Exhibit 8).

Later, when B.F.'s biological mother became pregnant again, the Plaintiff's adoptive parents decided that all the children needed to be together, and they applied to adopt B.F.'s youngest sister. Plaintiff's adoptive parents needed a special exemption to approve the adoption of six special needs children in one small home - and it was granted. Affidavit of Mother of B.F. ¶ 6 (Exhibit 8).

Although the Plaintiff and her siblings had serious issues resulting from their earlier years, things began to improve with the love and guidance of their adoptive parents. While B.F. adapted well to their new environment, things were not always easy. B.F. was often oppositional and was developmentally delayed, resulting in the need for special education. Deposition of Mother of B.F. at 16:1-20 (Exhibit 9). Yet, generally she progressed positively. The Plaintiff's adoptive parents worked with every available resource and, largely as a result of their own boundless love for children, they began to see B.F. improve, both cognitively and emotionally. Another set-back – not of their own making – was awaiting them where it should never have been: at school.

**B.    Early Issues at School**

**<u>1. Student B.F.</u>**

In 2006, the Plaintiff's adoptive parents enrolled B.F. in the Warren Consolidated School District. Beginning in the 2009-2010 school year, B.F. had issues with placing her hands down the back of her pants, which District

employees attributed to B.F.'s hygiene issues, specifically diaper rash. Deposition of Doreen Dickman 92:10-17 (Exhibit 10); Deposition of Joseph Konal 120:5- 7 (Exhibit 11). During the remainder of that school year and the summer, B.F.'s inappropriate self-touching transitioned to the groin area, when B.F. began to "inappropriately place her hands in her pants." Plaintiff's Harbor Oaks Records (Bates Stamps 00067-00069) (Exhibit 12); MISD Student Contact Log by Nicole Cutlip (Exhibit 13); Warren Consolidated Schools Individualized Education Program Report, June 6, 2011 (Exhibit 14).

B.F.'s teacher, William Walters, never contacted her parents for or with suggestions on how to address this issue. Deposition of William Walters 127:8-10 (Exhibit 5). The behaviors continued in the classroom for nearly eight months. The staff even screened B.F. off, isolating her from the rest of the class—in an effort to protect B.F.'s classmates from her behavior.  Deposition of William Walters 104:24-105:16; 117:17-23 (Exhibit 5); Affidavit of April Ceno (Exhibit 15).

Inexplicably, when B.F.'s inappropriate self-sexual contact began, no one at the school seemed concerned about –  or made any effort to determine the cause of –  the behavior. Behavioral Evaluation Report and Behavioral Strategy Plan 2011 (Exhibit 16); Deposition of Joseph Konal 125:15-20 (Exhibit 11). The cause became clear May 17, 2012, when it was discovered that B.H. had engaged in sexual contact with B.F. on her school bus.

6

This sexually assaultive behavior had occurred on a regular basis, in plain view of the bus aide – had she been awake. Warren Police Department Case Report (Exhibit 4). The perpetrator was identified as B.H., a youngster who had already been identified as having propensities toward highly inappropriate behavior.

## 2. Student B.H.

The District had great concerns about student B.H. long before this incident was reported. When he was in preschool, at Green Acres preschool in the Warren Consolidated Schools[2]. B.H. was flipping up fellow female classmate's skirts, and actually pulling down other children's mother's tops, and exposing their brassieres in the classroom. Deposition of Mother of B.H. p 36:1-17 (Exhibit 6).  B.H.'s mother learned of this action from the "the social worker at his preschool". *Id.* at 37:3-4.

B.H.'s mother went on to describe the behavior as starting in "preschool, got more in-depth as he got a little older when he got onto the computer, that's when he saw what he saw." *Id.* p 37:13-18.  His mother readily admitted that B.H. had had a problem from early on.  He was obsessed with nudity. *Id.* 34:9-16. Mrs. H. had informed the school about this for his protection as well as the protection of other students.  She stated:

---

[2]  While the witness did not recall if Green Acres is part of the Warren Consolidated Schools, the District's website establishes that it is.  See: http://school.wcskids.net/green/.

"I explained to the school all about how he had looked up naked women on the Internet and, of course, we immediately took the Internet away but this is why I told the school, we told them absolutely anything and everything that he was doing in order to try to protect him and the other kids." *Id.* at 34:19-25

Indeed, B.H's parents not only informed the School District of his obsession with nudity, but also his overall excessive physicality.  She described this in her deposition as including: "Punching. Choking.  Scratching.  He had pulled knifes [sic] and weapons" from ages 5-9, with some occasions being more intense. *Id.* 14:1-20. (Exhibit 6)

## C.    Specific Directives to the School District to Keep B.H. Away From Other Children

B.H.'s parents asked from the very beginning of B.H.'s attendance in the District, approximately five to six years, for assigned seating on the bus, and in spite of the school officials stating that it was a good idea, they were always "working on it." *Id.* at p 30:7-22 (Exhibit 6).  B.H.'s  mother also testified that there was no question in her mind that she had communicated to both Joseph Konal (Hatherly Elementary School Principal and Doreen Dickman (school social worker) the needed to keep B.H. and the other children separated and in assigned seats because of B.H.'s physicality, and his heightened sexuality and obsessive behavior. *Id* at 73:9-14. She testified that she had expressed this concern to Konal and Dickman "many times" *Id*. at 29:11-23 (Exhibit 6).

Helen Meduvsky was assigned as an aide by WCS to ride the Plaintiff and B.H.'s school bus. She was there to specifically avoid behaviors on the bus that were inappropriate or potentially harmful. But the aide and the driver to whom Plaintiff was assigned were wholly indifferent to what was happening; and simply ignoring what was there to be seen.

**D.     Additional Concerns About B.H. and B.F.**

B.H. and B.F. had known one another since early elementary school. On and off, they would refer to one another as "boyfriend and girlfriend, and that they were going to get married." *Id.* at 41:1-11 (Exhibit 6)The parents took obvious and reasonable precautions regarding this, by reporting it to the school. *Id.* at 40:17-41:17 (Exhibit 6). And on the few occasions that they had "play dates" they were always supervised. *Id.* at 84:11-17 (Exhibit 6).

**E.     The Precautions That Were Supposed to be Taken for B.H.'s and B.F.'s Bus Ride To School**

There is substantial testimony and admissions that the Defendants were well aware of B.H.'s propensity for being "hypersexual".  B.H.'s mother testified that it first became an issue in preschool at Green Acres, a Warren Consolidated Schools' preschool. B.H.'s parents, who were very concerned about their son's issues, complained to the Principal, Joseph Konal, regarding the aide, Helen Meduvsky,

allowing the children on B.F. and B.H.'s bus to sit wherever they wanted. Deposition of Joseph Konal 190:14-191:6 (Exhibit 11).

**F.     How B.H. was Accomplishing the Assaults**

The explanation of how the sexual contact occurred between B.H. and B.F. has been consistent among all those interviewed. B.H. would lure B.F. to the back of the bus "where the cameras won't see us", with a promise to allow her to use his iPod Touch. Once in the back of the bus, B.H. fondled B.F., and forced her to fondle him. The contact escalated over the months, with B.H. continuing to fondle B.F., forcing B.F. to fondle him, and taking pictures of her vagina on his iPod Touch. Warren Police Department Case Report (Exhibit 4).  B.H.'s mother has testified that B.H. admitted to her, inconsistent with the police report, that the contact was "his idea." Deposition of Mother of B.H. p. 47:3-6. (Exhibit 6).

Of course this "strategy" of moving to the back of the bus, and out of the view of the cameras should not have worked. There was an aide and bus driver on the bus, with *only seven children*.  The aide's role was to supervise these students with emotional disabilities. The driver admits that she shares the responsibility of supervising the students. Deposition of Judith Hirzel 89:18-90:15 (Exhibit 17). Part of the aide's job was to protect the children from themselves and others.   The bus aide should have had no difficulty seeing what was occurring on the bus had she only been looking. Deposition of Karen Henning 47:21-25 (Exhibit 7).

Warren Consolidated Schools was well aware of the potential, and indeed the likelihood for problems with certain students who rode the bus and assured the parents of the students that precautions would be taken. Deposition of Joseph Konal 60:8-24 (Exhibit 11). However, the aide only considered these directives to be recommendations, and felt free to ignore them. Deposition of Helen Meduvsky 37:13-21 (Exhibit 2).

Those directives included:

1.    Each student would have an assigned seat. Deposition of Deposition of Kerry Weishaupt 34-8:35-23 (Exhibit 18);

2.    No student would be allowed to sit next to another student, despite children ordinarily being allowed to do so. Deposition of Helen Meduvsky 36:6-38-1 (Exhibit 2).

3.    Cameras are mounted inside all district buses to monitor student behavior. Deposition of Kerry Weishaupt 27:3-11 (Exhibit 18);

4.    In addition, not only a bus driver, but an additional adult (aide) would be assigned to monitor student behavior. Deposition of Karen Henning 86:4-17 (Exhibit 7). The decision made by the special education director. Deposition of Kerry Weishaupt. 20:23-21:14.(Exhibit 18)

Warren Consolidated Schools designed these precautions to ensure that inappropriate contact would not occur. However, the school bus driver and/or the bus aide simply did not implement this design when B.F. was transported to school.  The first two and perhaps most important directives were ignored; students were not assigned to specific seats and they were allowed to sit next to each other on the bus. Deposition of Helen Meduvsky 21:1-25 (Exhibit 2). The testimony in

11

the case clearly establishes that the Principal, Joseph Konal; B.F.'s teacher, William Walters; and the school social worker, Doreen Dickman, all knew *that the plan existed but was not being implemented* by the bus aide. In spite of the risk, no one in the District did anything about the aide's refusal to implement the plan.

## G.    How Long Had the Sexual Assaults Been Occurring?

The School District and its administrators were well aware of the fact that the bus aide was not supervising the students for a number of years. Deposition of Joseph Konal 45:2-19 (Exhibit 11); Deposition of William Walters 43:21-45:1 (Exhibit 5); Deposition of Doreen Dickman 59:25-62:13 (Exhibit 10); and Helen Meduvsky verbal warnings (Exhibit 3).

Kerry Weishaupt ("Weishaupt"), the Director of transportation at the time, testified that he personally did not use the cameras that were located on the bus to monitor Helen Meduvsky's conduct or performance.    Deposition of Kerry Weishaupt  77:7-78:2 (Exhibit 18). Weishaupt also testified that when he came to the Department, while it was in need of real help, he had no system or process to determine what the problems were, rather he waited to be informed by others. Deposition of Kerry Weishaupt 58:25-59:23 (Exhibit 18). Nor did he log or keep track of complaints about employees *Id.* at 28:24-29:2 and 95:2-25.

Surprisingly, the District only used the video recording to observe particular incidents of student misconduct at the request of Principals in the District.

Deposition of Kerry Weishaupt  32:25-33:9 (Exhibit 18) .  As a result, there is no direct evidence of when the sexual conduct between Plaintiff B.F. and B.H. began on the bus, because, as Weishaupt admits, he was instructed not to do anything, including reviewing the tapes, and therefore the evidence that would have existed on the cameras was lost *Id.* 97:23-98:16. (Exhibit 18)

Pamela Lemerand, expert Psychologist/Special Education witness, and Plaintiff's treating behaviorist, April Ceno, agree that the most reliable source for determining when the sexual contact started is to determine when Plaintiff's public masturbation and regressive behavior began.   Affidavit of Dr. Pamela Anne Lemerand (Exhibit 19); and Affidavit of April Ceno (Exhibit 15). This timing is also consistent with the behavior of both students, who rode the bus together in the 2010-2011 school year until March, when B.H. was removed from the bus for bringing a knife to school.  B.H. educational records (Exhibit 20).

## H.    What did Warren Consolidated Schools Transportation Know and When Did They Know It?

According to the testimony in this case, bus aides were only assigned to buses that transported emotionally impaired students.[3] Deposition of Karen Henning  16:13-19;  17:8-11(Exhibit  7).  The  number  of  students  on  each

_____

[3] There were one-on-one aides that would travel with particular students with individual health needs.  However, only emotionally impaired students had an aide to monitor the entire bus.

emotionally impaired bus were limited in number (7-10 students) Deposition of

Helen Meduvsky 63:12-20 (Exhibit 2).

. This is evidence of a state created danger that the District was aware of, due to the

fact that they placed two adults on the school bus.

    Meduvsky's job responsibilities included the following:

    "The responsibilities of the bus aide are to:
- Supervise and ensure the safety of each student.
- Communicate perceived student problems and student involvement with teachers and staff.
- Manage the student's behavior on the bus by maintaining discipline and ensuring that each student stay in their own assigned seat. No student is allowed to sit with another student.
- Be centrally located amongst the students and alert and attentive to their behavior and/or needs.
- Work together as a team with the driver. You both are responsible for the students. Together, with the principal, teachers and parents the Bus Aide is part of the students' educational team. It is essential to communicate and document student issues/concerns through the use of written referral forms."

Meduvsky verbal warnings  (Exhibit 3);  Deposition of Karen Henning 83:20-84 (Exhibit 7):

It was equally clear that Meduvsky was not following these instructions and had no

intention of doing so.

    Similarly, the driver, Judy Hirzel,  never got the message.  She testified that

it was not her job to watch these students:

```
 7  Q    You've never been on a bus with an aide?
 8  A    Yeah, and then it's the bus aide's job.
 9  Q    Okay.  Is it the bus aide's job or is it both your
10       jobs?
11  A    Technically it's both our jobs, but when I'm driving
```

14

```
12      it's her job.  I cannot be telling -- know everything
13      that's going on behind me.  When I'm driving down the
14      road, there are times I cannot be watching the mirror
15      the whole time these students are on the bus.  I have
16      to pay attention to traffic.  If I see a problem, I
17      take care of it.  If I don't see a problem, I drive.  I
18      have to pay attention to the street.  My job is to
19      drive everybody to and from safely.
```

She went on to testify:

```
13      Q   Okay.  How was it different on the route that you were
14          driving with Helen as the aide?
15   A   You have somebody back there keeping them in line.  You
16          don't have to worry about it because she's back there
17          so you can watch the road.
```

Despite the fact that it was a joint responsibility of Hirzel and Meduvsky to supervise these children, Hirzel apparently not only missed seeing any inappropriate activity on the part of students, and as cited above, she was not watching for it.  She also only remembers that Meduvsky "loved everyone" and had no problems with anyone.  Deposition of Judith Hirzel 67:17-18 (Exhibit 17) This in spite of the fact that as Helen Meduvsky's union steward, she was present during three reprimands over similar issues in a year and a half.  *Id.* at 71:25-72:10 (Exhibit 17)

## <u>STANDARD OF REVIEW</u>

Defendants have moved for summary judgment under Fed. R. Civ. P. 56. Summary judgment is proper under Rule 56 only "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In determining whether summary judgment is proper, a court looks to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" Fed. R. Civ. P. 56(c)(1)(a)."As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim." *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir 2001).

A trial court "must accept Plaintiff's evidence as true and draw all reasonable inferences in [his] favor[,] viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiff." *Id.*  The Supreme Court emphasized the "general rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, ___ U.S. ___; 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). As such, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and courts must not engage in these inquiries in deciding a motion for summary judgment. *Anderson*, 477 U.S. at 255.

<u>**ARGUMENT**</u>

I.   **PLAINTIFF'S CLAIMS UNDER M.C.L. § 722.623 ARE NOT SUBJECT TO SUMMARY DISPOSITION BECAUSE THEY HAD REASONABLE CAUSE TO SUSPECT ABUSE BUT FAILED TO REPORT IT**

M.C.L. § 722.623 provides, in relevant part that:

A … social worker, licensed master's social worker, licensed bachelor's social worker . . . school administrator, school counselor or teacher … who has reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of the suspected child abuse or neglect to the department. Within 72 hours after making the oral report, the reporting person shall file a written report as required in this act.

The evidence here shows that Defendants failed to report the abuse of Plaintiff long after they each had "reasonable cause" to suspect that she was being abused.   Defendants further challenge their liability by incorrectly citing the principles of *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000), that they must be both grossly negligent and "the" proximate cause of the abuse before liability can exist.   Their excuses fail, both because *Robinson* should have no application to this claim, and because, in any event, both requirements are satisfied in this case.

   **A. M.C.L. § 722.623 should not be interpreted as being subject to governmental immunity provisions.**

Plaintiff acknowledges that in *Jones v. Bitner*, 300 Mich. App. 65, 832 N.W.2d 426 (2013), the Michigan Court of Appeals held to the contrary – that the

17

reporting statute was subject to *Robinson v. City of Detroit*, *supra* and the other hurdles of governmental immunity as codified in M.C.L. § 691.1407(2). However, this Court should not give effect to *Jones*, because that case was wrongly decided.

It is axiomatic that "courts should not render statutes nugatory through construction." *U.S. v. Tohono O'Odham Nation*, 131 S.Ct. 1723, 1730 (2011); see also *Apsey v. Memorial Hosp.*, 477 Mich. 120, 132 (2007) ("[A] reviewing court should not interpret a statute in such a manner as to render it nugatory.") *Jones'* interpretation of M.C.L. § 722.623 as subject to *Robinson* renders the statute a virtual nullity to all government employees, whose gross negligence in failing to report abuse will *always* be trumped as the "the one most immediate, efficient, and direct cause" of the plaintiff's injuries by the conduct of a third-party physical or emotional abuser. It is preposterous that, in enacting under M.C.L. § 722.623 that school administrators, counselors, and teachers are mandatory reporters of suspected child abuse, the legislature intended to cover only *private school* administrators, counselors, and teachers. That conclusion is further buttressed by the fact that other classes of mandatory reporters under § 722.623(1)(a) are exclusively public sector employees, including persons "employed in a professional capacity in any office of the friend of the court" and law enforcement personnel. Application of Michigan governmental immunity would discharge these mandatory reporters from civil liability, and render a major enforcement provision

18

of the law utterly toothless. Accordingly, it <u>is</u> exceedingly likely that, if the Michigan Supreme Court was to consider *Jones*, it would overrule that decision[4]. Under such circumstances, this Court should disregard *Jon*es. *In re Akron-Cleveland Auto Rental, Inc. v. Akron-Cleveland Auto Rental, Inc.*, 921 F.2d 659, 662 (6th Cir. 1990).

Moreover, logic supports a rejection of *Jones*. To assess Defendants' liability under § 722.623 by contemplating "the" proximate cause would essentially negate liability for failure to report. The reporting statute assigns liability for failure to fulfill a specific duty in a specific context under specific circumstances. Despite the Michigan Legislature's enactment of the GTLA, it made no indication that the liability provision of the reporting statute was no longer effective, by repealing it or indicating otherwise. Had the Legislature intended for liability specifically provided under the reporting statute to be abolished or limited by the GTLA, it would have expressly done so.

Indeed, the reporting statute clearly indicates a distinction between failing to report acts of abuse and the act of abuse itself. Liability under the reporting statute is based on damages that are "proximately caused *by the failure* [to report.]" M.C.L. § 722.633(1). The damages caused by failing to report an act of abuse is

_____

[4] The opinion in *Jones* construing M.C.L. § 722.623 was not appealed to the Michigan Supreme Court.

placing the abused child in a position where the abuse will not be prevented and will likely continue to occur. The statute already takes into account that there will be damages that are not attributable to the failure to report because they had occurred before the report could have been made. The premise of the reporting statute is that there are damages caused irrespective of the failure to report and damages that arise *because* of the failure to report. Only the latter are actionable. "The" proximate cause *of failing to prevent future abuse* that is likely to recur if not reported, or "the one most immediate, efficient, and direct cause[,]" is the individual that fails to report the act of abuse. Accordingly, summary judgment should be denied.

### B. Even if the Court applies *Robinson*, Defendants still are not entitled to summary judgment.

M.C.L. § 691.1407(2) provides immunity under state law only if <u>all</u> of the following are met: a) the employee "is acting or reasonably believes he or she is acting within the scope of his or her authority"; b) the governmental agency for which the employee works was "engaged in the exercise or discharge of a governmental function"; and c) the employee's conduct does not amount to "gross negligence that is the proximate cause of the injury or damage." It is the third prong that is at issue in this matter.

### 1. *Defendants Were Grossly Negligent.*

Gross negligence is defined under Michigan law as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." M.C.L. § 691.1407(8)(a). The Sixth Circuit has held that the deliberate indifference standard applied pursuant to 42 U.S.C. § 1983 is more stringent than the gross negligence standard under Michigan law. *Jones v. Muskegon County*, 625 F.3d 935, 947 (6th Cir. 2010). Accordingly, as Defendants were deliberately indifferent to the abuse suffered by Plaintiff for all the reasons identified in Sections E,G, and H of this Brief, their inadequate actions and total inactions thereto also constitute gross negligence under Michigan law.

2.  *Defendants Were "The" Proximate Cause of Plaintiff's Injuries.*

M.C.L. § 691.1407(2)(c) provides that, once gross negligence is proven, a plaintiff must also prove that the defendant's conduct was "the proximate cause of the [plaintiff's] injury or damage." The Michigan Supreme Court has held that, within the context of M.C.L. § 691.1407, "the proximate cause" means "the one most immediate, efficient, and direct cause" of the plaintiff's injuries. *Robinson*, 462 Mich. 439, 459 (2000).

At least one Michigan federal court has refused to apply the *Robinson* standard where the actions or inactions of multiple governmental agents combine to produce an indivisible injury in a plaintiff. In *Murphy v. Gilman*, 551 F.Supp.2d

21

677, 682 (W.D. Mich. 2008), Judge Arthur J. Tarnow[5] noted the absurdity

countenanced by a literalist application of *Robinson* where the defendants were all

government actors:

> By contrast, Defendants fail to explain what or whose alternative
> conduct is "the most immediate, efficient, and direct cause" of Mr.
> Clark's injuries and death. Instead, Defendants argue that because the
> jury apportioned fault across four Defendants, there is no *one* proximate
> cause. Therefore, the gross negligence exception to governmental
> immunity applies to none of them. Defendants' argument would lead to
> the absurd result that where there were multiple wrong doers, none
> would be liable.

*Id.* (emphasis supplied). *Murphy* stands for the entirely common sense proposition

that when multiple governmental defendants have been grossly negligent, liability

for that gross negligence can be shared by all defendants, lest the farcical result

occur that if no party is 100% at fault, *nobody* is liable.

In the instant case, the evidence clearly shows that Defendants did not

merely fail to stop the abuse of Plaintiff; rather, they *fostered* it by their abject

disregard of concrete evidence of abuse.  Defendants were on notice of specific

evidence that Plaintiff was being abused, by virtue of her constant self-

gratification, masturbation, and hypersexuality, and affirmatively chose to do

nothing about that evidence.  Those actions and inactions were wholly inadequate,

and grossly negligent, under the circumstances.  Defendants can and should be

---

[5] Eastern District of Michigan Judge Arthur J. Tarnow was sitting in the Western
District of Michigan to hear this case.

considered "the" proximate cause of Plaintiff's injuries in combination with their governmental cohorts.  Accordingly, *Robinson* does not bar Plaintiff's claim.

## II.   PLAINTIFF'S TITLE IX CLAIM IS NOT AMENABLE TO SUMMARY JUDGMENT.

Under Title IX, 20 U.S.C. § 1681, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.  20 U.S.C. § 1681(a).  For a plaintiff to establish a prima facie case of student-on-student sexual harassment under Title IX, he or she must demonstrate that "(1) the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment."  *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444-45 (6th Cir. 2009).  Defendants' attack on Plaintiff's Title IX claim is largely fact-specific – and because Plaintiff has adduced substantial contrary facts on each of these elements, summary judgment is inappropriate.

### A. Plaintiff has shown harassment that was severe or pervasive

In their brief, <u>Defendants do not contest this point</u>.  Nor could they credibly do so.  The facts shown above demonstrate that B.H.'s actions toward Plaintiff

constituted criminal sexual conduct in at least the second degree, and likely the first degree, under Michigan law.  <u>See</u> M.C.L. § 750.520b and M.C.L. § 750.520c. The Sixth Circuit has held that evidence that a plaintiff was raped[6] "obviously qualifies as being severe, pervasive, and objectively offensive sexual harassment that could deprive [plaintiff] of access to the educational opportunities provided by her school."  *Soper v. Hoben*, 195 F.3d 845, 854-55 (6th Cir. 1999).  Thus, Plaintiff has proven her prima facie case on this point.

### B.  Plaintiff has shown actual notice of the harassment.

A plaintiff alleging Title IX violations based on sexual harassment in a school setting must prove that "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of" the harassment.  *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 277 (1998).

The "actual notice" prong of the Title IX rubric does not require that an appropriate official have actual notice of harassment *of the plaintiff*.  Rather, notice of incidents involving other students will suffice.  <u>See</u>, <u>e.g.</u>, *Baynard v. Malone*, 268 F.3d 228, 238 n. 9 (4th Cir. 2001) ("We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being

---

[6] Michigan's criminal sexual conduct statute is its equivalent of a rape statute, as demonstrated by the fact that the Michigan legislature's printing of the applicable section of the penal code specifically refers to it as the "rape" section.

abused."); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (same).

Thus, the proper inquiry is whether the school district was on notice that there was

"a substantial risk of sexual abuse to children in the school district."  *Williams ex*

*rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 363 (6th Cir. 2005); see

also *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360-61 (3d Cir. 2005) (upholding

jury instructions that defined "actual notice" as when a school official has

"knowledge of facts sufficiently indicating substantial danger to a student.").

As detailed extensively *supra*, WCS had been on notice of B.H.'s overly-

sexual tendencies since he was a *preschooler*, when he was flipped up girls' skirts

and pulled down mothers' tops, exposing their brassieres in the classroom.  As he

grew older, B.H.'s parents repeatedly and very specifically warned WCS officials,

including the school principal, Konal, as well as Weishaupt and Henning, about his

proclivity toward violence and obsession with nudity and sexual gratification, and

they pleaded with those same officials to separate B.H. from other students

because of those tendencies.  They further warned those same officials that, despite

WCS directives, B.H. was not being separated from other students, including

Plaintiff, on the school bus.

Standing alone, this information certainly created actual knowledge in WCS

that B.H. presented a "substantial danger" to his fellow students – particularly

those on his bus.  And, as described previously, while it is not necessary for a

district to have knowledge of the specific recipient of the harassment for Title IX liability to lie, WCS officials certainly had actual notice that Plaintiff, who was on the same bus route as B.H., was likely the victim, because of her chronic masturbatory actions.

Defendants attempt to minimize the degree of actual knowledge by claiming that "children, including special education children, may occasionally have behavioral problems."  This flippant rationalization is entirely consistent with the indifference accorded to the entirety of B.H.'s abuse by WCS, and utterly ignores the volume and magnitude of B.H.'s conduct over many years, including the sexual harassment of his preschool classmates, and their mothers, on school grounds. And, given B.H.'s parents' repeated warnings about how his behavior was becoming *more* egregious as he grew older, the earlier conduct could not and cannot be dismissed as mere child's play.

*Lopez v. Metropolitan Gov't of Nashville and Davidson Cty.*, 646 F.Supp.2d 891 (M.D. Tenn. 2009) is factually similar and legally identical to the instant case. *Lopez* involved the rape of a nine-year old special education student on a school bus by a fellow special education student.  The perpetrator was permitted to ride the school bus without adequate supervision despite an extensive record of inappropriate sexual conduct on school grounds.  The defendant school district sought summary judgment on plaintiff's Title IX count, claiming that it did not

26

have "actual notice" of the harassment.  The trial court denied the motion, finding that the district "had knowledge of the proclivities of [the abuser] sufficient to hold it liable for his alleged actions in his case."  *Id.* at 916.  The defendants in *Lopez*, like Defendants here, minimized the abuser's prior behavior as "age appropriate" and otherwise innocuous.  However, the court found that complaints about the abuser's conduct on the school bus, and his "admitted sexual activity, make it clear that an alleged rape of a student by [the abuser] on a Metro school bus was certainly possible."  *Id.*

Moreover, the *Lopez* defendants, like the instant defendants, claim that actual notice of the conduct act issue never reached a level high enough within the district for Title IX liability to attach: "Metro points out that '[c]ourts have specifically found that school bus drivers, teachers and custodians were not appropriate persons under the statute because they do not have authority to terminate or suspend the offending individual.'"  *Id.*  This is identical to the argument made by these Defendants on page 12 of their brief.  The *Lopez* court rejected the argument because "[t]his is simply not a situation where only a teacher, or bus driver, or custodian had knowledge about a potential problem[.]"  *Id.* at 917.  Rather, the court noted that the school principal and other administrators were on notice of the abuser's history.  *Id.*  In the instant case, at a minimum, the building principal, Defendant Konal, was on notice of B.H.'s prior

misconduct and the fact that he was not being properly supervised and separated from other students on the bus despite the actual, substantial risk of harm to his classmates. Under *Gebser*, *supra*, this is sufficient to satisfy the actual notice requirement. See also *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 457 (8th Cir. 2009) ("[i]t is apparent from Supreme Court precedent . . . that school principals are considered 'appropriate persons' in the Title IX analysis.") (citing *Gebser* and *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999)).

### C. Plaintiff has shown deliberate indifference to the harassment.

In describing the proof necessary to establish deliberate indifference, the Supreme Court has held that it may exist where the response to a constitutional violation "is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648 (1999)[7]; accordingly, while no particular response is required, the obligation is to "respond and . . . do so reasonably in light of the known circumstances." *Vance v. Spencer Cty. Public Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000). Deliberate indifference does not require proof that the defendant "fully appreciated the harmful consequences" of her actions, "because deliberate indifference is not the same as action or inaction taken 'maliciously or sadistically

---

[7] The Sixth Circuit has clarified that deliberate indifference has "substantially the same meaning" under both Title IX and 42 U.S.C § 1983. *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005). Thus, cases interpreting deliberate indifference under § 1983 are relevant when discussing Title IX deliberate indifference, and vice versa.

for the very purpose of causing harm.'" *Id.* (quoting *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134 (2d Cir. 1999)). Similarly, a defendant need not have actual knowledge of abuse; rather, it is enough to "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (cited approvingly in *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002).

In interpreting *Vance*, the leading Sixth Circuit case on deliberate indifference in the school context, one district court noted:

> In *Vance,* the defendant-school district argued essentially that as long as it had done "something" in response to the harassment of a student, it had satisfied the standard. The Sixth Circuit expressly rejected this theory noting that this interpretation of deliberate indifference would permit a school district to satisfy its obligations by "merely investigating and absolutely nothing more. Such a minimalist response is not within the contemplation of a reasonable response." *Id.* at 260. Thus, "where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."

*Hart v. Paint Valley Local Sch. Dist.*, 2002 WL 31951264, at *8 (S.D. Ohio 2002) (Exhibit 21) (quoting *Vance*, 231 F.3d at 261).

Defendants claim that they were not deliberately indifferent to Plaintiff's rights, but bases that claim on a misleading and woefully incomplete factual picture. The factual record in this matter establishes that B.H.'s parents practically

*begged* the administration to keep B.H. separate from his classmates, and "told the school, absolutely anything and everything that he was doing in order to try to protect him and the other kids." *Deposition of Mother of B.H.* at 34:17-25 (Exhibit 6). (Moreover, had Defendants bothered to put two and two together, they would have realized that Plaintiff was B.H.'s victim.[8])

A reasonable jury could readily find that in response, B.H.'s parents were essentially given the run-around by WCS. B.H.'s parents were told that WCS was "working on it" – seemingly in perpetuity, with extraordinarily little action taken, despite the admission that meaningful action would have been a "good idea." *Id*.at 30. In fact, the only action taken was perhaps worse than no action at all: WCS placed on the bus a monitor who was specifically known to 1) consider the administration's rules on the bus as merely advisory; and, 2) sleep on the bus, *including specifically ignoring the students on the bus so she could sleep*. WCS considers this an appropriate response. Plaintiff contends that this is a paradigmatic case of a response that is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648 (1999). Resolution of the dispute is for the jury to decide.

---

[8] But this is not necessary for liability to attach. It is enough that the school officials had an awareness of the dangers to the community.

Defendants' reliance upon *McCoy v. Bd. of Educ., Columbus City Schools*, 515 Fed. Appx. 387 (6th Cir. 2013), is misplaced.  In *McCoy*, the Sixth Circuit noted that in response to allegations of sexual misconduct, the defendant board of education "conducted an informal investigation in each instance . . . ." *Id.* at *4. Here, in response to B.H.'s prior bad acts in the school, and his parents' specific notice to the school district regarding his overly-sexual and violent tendencies, Defendants did not perform an investigation.  The instant case is far closer to *Vance*, *supra*, in which deliberate indifference was found where an investigation was never performed by the school district despite allegations of "verbal and physical harassment."  *McCoy* at *4 (citing *Vance*, 231 F.3d at 256-57.  The *McCoy* court noted that the *Vance* court properly found that "inaction in these circumstances reflected a deliberate indifference." *Id.*  Here, these Defendants did *worse* than nothing: they placed B.H. into the general special education population and affirmatively placed him on the bus route with Plaintiff and other children, and without adequate supervision or controls.

Accordingly, summary judgment must be denied.

### III.   PLAINTIFF'S CLAIMS UNDER THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (M.C.L. § 37.2102) ARE NOT AMENABLE TO SUMMARY JUDGMENT, BECAUSE DEFENDANTS HAD ACTUAL KNOWLEDGE OF THE HARASSING BEHAVIOR, YET DID NOTHING,

Plaintiff has brought hostile environment claims under the Michigan Elliott-Larsen Civil Rights Act, M.C.L. § 37.2102.  In order to establish a *prima facie* case under the statute, a plaintiff must prove: 1) that she belonged to a protected group; 2) she was subjected to communication or conduct on the basis of sex; 3) she was subjected to unwelcome sexual conduct or communication; 4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her education or created an intimidating, hostile, or offensive environment; and 5) *respondeat superior*.  *Johnson v. University of Michigan Regents*,[9] 2004 WL 2873831, *3 (Exhibit 22) (citing *Chambers v. Trettco*, 463 Mich. 297, 310 (2000)) Sex is a protected group under the Act.  M.C.L. § 37.2102 (1).   A defendant is liable for hostile environment sexual harassment under *respondeat superior* principles if it failed to investigate and take prompt, appropriate remedial action after having been put on actual or constructive notice of the harassing conduct.  *Chambers*, 463 Mich. at 313; *Sheridan v. Forest Hills Public Schools*, 247 Mich. App. 611, 621 (2001).  A plaintiff can demonstrate that a defendant knew of the harassment by "showing that she complained to higher

---

[9] While *Johnson* is unpublished, Plaintiff cites to this case because it demonstrates that Elliott-Larsen hostile environment claims can lie in an educational setting.

management of the harassment … <u>or by showing the pervasiveness of the</u> <u>harassment, which gives rise to the inference of knowledge or constructive</u> <u>knowledge.</u>" *McCarthy v. State Farm Ins. Co.*, 170 Mich. App. 451, 457, 428 NW2d 692 (1988), (overruled on other grounds in *Norris v. State Farm Fire and Casualty Co.,* 229 Mich. App. 231, 581 N.W.2d 746 (2001)) .

Thus, the elements of an Elliott-Larsen claim are substantially similar to those Plaintiff has already addressed in response to Defendants' challenges to his federal claims.  For the same reasons underlying Plaintiff's claims that she was subjected to severe or pervasive harassment and abuse for the purposes of Title IX, she was subjected to communications and/or harassment on the basis of sex, and that conduct created a hostile, intimidating, and/or offensive environment (and, in the alternative, substantially interfered with her education).  *Respondeat superior* liability is established in the same allegations Plaintiff has lodged in which, under Title IX, Defendants also had actual knowledge of the harassment and were deliberately indifferent thereto.  (In fact, the standard under Elliott-Larsen is lower in this regard, as constructive notice suffices.)  Accordingly, for substantially the same reasons that Plaintiff's claims under Title IX and § 1983 (as described below) should not be dismissed, so too must the Motion be denied as to Plaintiff's Elliott-Larsen claims.

## IV. PLAINTIFF'S CLAIMS UNDER 42 U.S.C. § 1983 ARE NOT AMENABLE TO SUMMARY JUDGMENT, BECAUSE DELIBERATE INDIFFERENCE IS SHOWN AT EACH PHASE OF THE CASE

In the instant matter, Plaintiff has adduced significant, substantial facts tending to show that Defendants increased the risk of danger to her such that they caused her constitutional injury.  Moreover, the law regarding same is well-established, such that the individual Defendants' claims of qualified immunity must be denied as well.

### A. The danger encountered by Plaintiff was state-created by these Defendants.

In *DeShaney v. Winnebago Cty. Dept. of Soc. Svcs.*, 489 U.S. 189 (1989), the Supreme Court identified two circumstances in which government actors may be found to have assumed a duty to protect an individual against the actions of a private party.  The first exception applies where a special relationship exists between the governmental actor and the plaintiff.  The Sixth Circuit has held, as a matter of law that no special relationship exists between a school and its students sufficient to create a constitutional duty.  *Soper v. Hoben*, *supra*, 195 F.3d at 853; *Doe v. Claiborne Cty.*, 103 F.3d 495, 510 (6th Cir. 1996).  Accordingly, Plaintiff does not pursue relief under that exception.

However, the second exception – the "state-created danger" exception – clearly *does* apply here.  "Liability under the state-created-danger theory is

34

predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). Such a duty is created because "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snakepit." *Id.* (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)). Under such circumstances, liability exists where a plaintiff "would not have been exposed to the dangers . . . but for the affirmative acts of the state[.]" *Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001).

The Sixth Circuit applies a three-part test to determine the viability of a state-created danger claim; a prima facie case is stated where there is "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished for a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Jones v. Reynolds*, 438 F.3d 685, 690-91 (6th Cir. 2005).

With regard to the first prong of the test, because it is often difficult to draw a bright line between action and inaction, the Sixth Circuit has refined the test by

focusing upon "whether [the victim] was safer before the state action than he was after it." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003). Here, there is no question that WCS and its agents affirmatively increased the danger to Plaintiff by assigning B.H. – whose noxious propensities were well known to Defendants – to ride on a school bus with other students, without adequate or meaningful supervision, and where it was aware that its rules and regulations were not being followed. Plaintiff was indeed safer before Defendants made that decision. Again, *Lopez v. Metropolitan Gov't of Nashville and Davidson Cty.*, *supra*, is instructive:

> In this case, Plaintiff has presented evidence from which a reasonable jury could conclude that Metro engaged in conduct which placed Gilberto specifically at risk and created or increased a risk of harm to him. [ . . . ] Plaintiff alleges that Metro did so in spite of her plea that her son be placed on a school bus with a monitor, and Ms. Harris's pleas that her son Kolby not be placed on a school bus with young children. Instead of heeding such pleas, Kolby was placed on a school bus where he had relatively free reign, even though he had previously been under a Bus Safety Plan for his prior assault which was meant to insure that he be isolated from other children. Even after the alleged rape, Metro allowed Gilberto and Kolby to ride the same bus for another week. The Court finds that a jury could conclude from the evidence that Gilberto was less safe after Metro assigned him and Kolby to ride the same bus. 646 F. Supp.2d at 910.

The parallels to the instant case are inescapable. Both cases involve pleas *by the parents of the abusing student* that their child, each of whom had known sexual behavior problems and violent tendencies, not be allowed free reign on a school bus. In both cases, the warnings were disregarded, and the district affirmatively

36

chose to place the dangerous student onto the bus with other students.  Thus, just as an affirmative act was found to exist in *Lopez*, so too it exists here.

With regard to the second prong, that the state's actions place plaintiff at risk as opposed to the general public, that too exists here.  A plaintiff may satisfy this requirement when "the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims."  *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006).  By contrast, where the alleged third-party wrongdoer was "no more a danger to [the plaintiff] than to any other citizen," the requirement is not satisfied.  *Jones v. City of Carlisle, Ky.*, 3 F.3d 945, 949 (6th Cir. 1993).  The Sixth Circuit has noted that where plaintiff is a member of a "limited and specifically definable group," that suffices to satisfy the requirement. *Waller v. Trippett*, 49 Fed. Appx. 45, 50 (6th Cir. 2002); see also *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (holding that the plaintiff failed to satisfy the requirement because the government defendant's actions "did not create a 'special danger' to a discrete class of individuals . . . as opposed to a general traffic risk to pedestrians and other automobiles.").  Plaintiff clearly was a member of a "limited and specifically definable group": the group of seven children (six, when removing B.H. from the tally) who were on the school bus, and thus were potential victims of B.H.  That certainly is a small enough group where the Defendants could have named "the possible victim or victims" at the time they

took their action.  The general public was not in danger, but Plaintiff and her bus-mates were.  Thus, the second requirement is satisfied.

With regard to the third prong of the test, for all the reasons previously stated in this brief, Defendants *clearly* knew or, at the very least, should have known, that their action of placing B.H. on the bus with other students and without meaningful supervision or enforced assigned seating gravely endangered the other children on the bus, including Plaintiff.  Defendants had actual notice of specific evidence, and indeed, *pleas* from B.H.'s parents, that they not do so; yet, they did anyway.

Defendants' reliance upon *Soper v. Hoben*[10], 195 F.3d 845 (6th Cir. 1999) is misplaced because *Soper* contains no discussion of the state-created danger doctrine upon which Plaintiff relies in this case.  Similarly, Defendants' reliance upon *Molina v. Bd. of Educ. of School Dist. for City of Detroit*, 2007 WL 4454928 (E.D. Mich. 2007)  (Exhibit 23) fails, because that case is inapposite to the instant matter.  In *Molina*, Judge Edmunds noted that the defendant district's affirmative actions did not place plaintiff in any additional danger:

> The danger to Jeremias was created by J.B.'s presence in their shared classroom and by J.B.'s close proximity to him during each school day at Higgins Elementary School. When J.B. was returned to Jeremias's classroom after his suspension, Defendants merely subjected him to a

---

[10] This case is cited by Defendants as *Soper v. Huron Valley School District,* 195 F. 3d 845 (6th Cir. 1999).

preexisting danger. If Defendants had not promised Plaintiff that they would put J.B. in a separate classroom, Jeremias would have faced just as much danger as he in fact faced after Defendants' alleged affirmative acts. This is not enough to state a claim for relief under the state-created-danger exception to *DeShaney*. Plaintiff has not and cannot allege that Jeremias was safer before Defendants' alleged affirmative acts than he was after.

*Id.* at *6.  By contrast, Plaintiff would not have been exposed to danger *at all* were it not for Defendants' actions in placing B.H. on her school bus without adequate supervision or controls, after they already knew of B.H.'s noxious tendencies.  The instant case does not present a circumstance where Defendants returned Plaintiff to an existing danger; rather, without Defendants' specific, wrongful actions, Plaintiff would not have experienced danger at all.  In sum, Plaintiff was indeed "safer before Defendants' alleged affirmative acts than [s]he was after." *Id.*

Accordingly, all three elements of the state-created danger test are satisfied, and Plaintiff's claims are not subject to summary judgment.

### B. Plaintiff's claims against the individual defendants are brought against them in their individual capacity.

Defendants feign ignorance and pretend that Plaintiff has not sued "the individuals in their individual capacity."  Nonsense.  Plaintiff acknowledges that monetary damages are unavailable against individual government employees and agents sued under 42 U.S.C. § 1983 in their official capacity.  Thus, if this was a

39

genuine issue, one would reasonably have expected Defendants to have raised this issue in a motion to dismiss early in the proceedings, when pleadings could have been more easily amended and the parties could have proceeded accordingly. Instead, Defendants disingenuously raise the issue after the close of discovery. The Court should not countenance such "sandbagging" by Defendants, especially because their position is contrary to law. Defendants state on page 29 of their brief that "if a complaint does 'not specify the capacity in which [a plaintiff] sues the individual defendants, the complaint is construed as suing them in their official capacity as employees of the state and [a] claim for monetary damages must fail. *Wells v. Brown, Jr.*, 891 F.2d 591, 592 (6th Cir. 1989)." Unfortunately for Defendants, in *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001), the Sixth Circuit explicitly rejected Defendants' reading of *Wells*: "Although other courts have read *Wells* to establish a per se rule requiring § 1983 plaintiffs to affirmatively plead 'individual capacity' in their complaint, we have never applied such a strict interpretation." (Internal citations omitted).

Instead, the Sixth Circuit noted that it "appl[ies] a 'course of proceedings' test to determine whether 42 U.S.C. § 1983 defendants have received notice of the plaintiff's intent to hold them personally liable[.]" *Id.* at 773. The *Moore* court then noted that, *inter alia*, listing the officers' names and not their official titles in the caption, reference to the defendants as "individual defendants," and notice that

plaintiff was seeking compensatory and punitive damages against each of the defendants "likely provided sufficient notice to the officers that they were being sued as individuals." *Id*. Even a cursory view of the amended complaint in this matter [Dkt. no. 7] shows the presence of each of these factors. The caption is devoid of reference to the individual Defendants' official titles. The "individual defendants" are collectively referred to as such in paragraphs 24 and 48. Most importantly, the final paragraph of the § 1983 counts against each and every one of the individual Defendants specifies that "plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant [] in an amount in excess of Seventy-Five Thousand and no/100 ($75,000) Dollars along with costs, interest and attorney fees so wrongfully incurred." There is no question that, in applying *Moore*, the course of proceedings in this matter certainly put Defendants on notice that they were being sued in their individual capacities.

Finally, *Abdur-Rahman v. Michigan Dept. of Corrections*, 65 F.3d 489, 491 (6th Cir. 1995), makes it clear that a response to a motion for summary judgment may provide sufficient notice to a defendant as to whether he is being sued in his individual or official capacities. Lest there be any doubt, Plaintiff has sued the individual Defendants in their individual capacities. In the alternative, Plaintiff requests that the Court grant leave for her to amend her complaint under Fed. R.

Civ. P. 15(a)(2).   Under the circumstances presented here, Plaintiff respectfully submits that "justice so requires" such an amendment.

### C. The individual Defendants are not entitled to qualified immunity.

Individual government officials may invoke qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court, "viewing the facts in the light most favorable to the plaintiff, determines whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of the defendant's alleged misconduct." *Grawey v. Drury*, 567 F.3d 302, 308 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  When evaluating qualified immunity claims by school officials, courts "need to look objectively at the specific circumstances of the school and child.  'There need not be a case dealing with these particular facts to find a [school official's] conduct unreasonable.'"  *Preschooler II*, *supra*, 479 F.3d at 1181 (quoting *Doe ex rel. Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906 (9th Cir. 2003).

The Supreme Court has emphasized "the importance of drawing inferences in favor of the nonmovant" when addressing questions of qualified immunity for

purposes of summary judgment. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

When addressing either prong of the qualified immunity test, "courts may not

resolve genuine disputes of fact in favor of the party seeking summary judgment."

*Tolan*, 134 S. Ct. at 1866; *Sova v. City of Mount Pleasant*, 142 F.3d 898, 903 (6th

Cir. 1998) ("Given the parties' divergent views of the events…the District Court

erred when it…reached [a] decision by crediting the officers' version of the fact

over [the plaintiff's] contrary evidence of how the killing occurred."). Rather,

"courts are required to view the facts and draw reasonable inferences 'in the light

most favorable to the party opposing the [summary judgment] motion[,]'" which,

"[i]n qualified immunity cases[,]…usually means adopting the plaintiff's version

of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Where "the legal question

of qualified immunity turns upon which version of the facts one accepts, the jury,

not the judge, must determine liability." *Sova*, 142 F.3d at 903 (citations omitted);

see also *Preschooler II v. Clark County School*, 479 F.3d 1175, 1180 (9th Cir.

2007) ("The school officials belittle the allegations and claim that [defendant's]

conduct cannot be considered anything more than, at the very worst, "a failure to

conform to best practices." This effort to candy-coat the claims ignores the court's

obligation to accept the allegations as true and to characterize the alleged abuses in

the light most favorable to [plaintiff].").

43

The first inquiry of the qualified immunity analysis examines whether "the facts alleged show the [official's] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second step of the qualified immunity analysis examines "whether the constitutional right at issue was clearly established" at the time of the official's conduct. *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). An official will be denied qualified immunity if he violates a statutory or constitutional right that was "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987).

While Defendants believe that a jury will accept their explanations, Plaintiff contends that the jury will instead accept the overwhelming evidence that Defendants were woefully and deliberately indifferent to the clear threat B.H. presented. At this stage, the Court must give Plaintiff's view of the facts special solicitude, and, in any event, cannot simply adopt Defendants' rationalizations. Moreover, it has been clear since *Doe v. Claiborne County*, issued by the Sixth Circuit in 1996, that sexual abuse of the type which occurred in the instant case is a

44

constitutional tort.  The other foregoing authorities, as cited by Plaintiff, regarding the applicability of the state-created danger exception, are neither new nor novel. Accordingly, Plaintiff's "constitutional right . . . was clearly established" at the time of the conduct implicated here, *Sample v. Bailey*, *supra*, 409 F.3d at 698, and therefore qualified immunity does not apply.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Plaintiff respectfully requests that the Motion for Summary Judgment be denied in its entirety.

Respectfully submitted,

SEIKALY STEWART & BENNETT, P.C.
Attorneys for Plaintiff

By:   /s/ William R. Seikaly
William R. Seikaly (P33165)
Benjamin J. Wilensky (P75302)
30445 Northwestern Hwy., Ste. 250
Farmington Hills, Michigan 48334
(248) 785-0102
wrs@sslawpc.com

Dated: August 7, 2015

## CERTIFICATE OF SERVICE

Choi T. Portis hereby certifies that on this 7th day of August, 2015, she filed the foregoing document with the Clerk of the Court via the Court's ECF system, which will automatically serve the document upon all counsel of record.

/s/ Choi T. Portis